# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| SUZANNE FAIRLIE and ODIS WRIGHT, on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>    vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY and TRANSAMERICA PREMIER LIFE INSURANCE COMPANY,<br><br>        Defendants. | Case No.: 18-32<br><br><br><br><br><br>**CLASS ACTION COMPLAINT** |

1.     Plaintiffs Suzanne Fairlie and Odis Wright bring this lawsuit on behalf of themselves and all others similarly situated against Defendants, Transamerica Life Insurance Company ("Transamerica Life") and Transamerica Premier Life Insurance Company ("Transamerica Premier") (together, "Transamerica" or "Defendants").   Plaintiffs allege the following based on personal knowledge of all facts related to themselves and on information and belief concerning all other matters:

## NATURE OF THE ACTION

2.     This case arises from Transamerica's breach of express and implied contractual obligations contained in its universal life insurance policies, a type of life insurance generally offering more flexibility than traditional "term" and "whole" policies.   Under a universal life insurance policy, a policyholder will deposit premiums into an accumulation account.   In turn, a life insurance company, like Transamerica, will withdraw a monthly deduction from each policyholder's account and deposit a separate amount of interest.   Interest accrues on the account's balance based upon minimum rates and average annual rates guaranteed by each policy.   Universal

1

life insurance policies allow policyholders to alter the amount and frequency of their premium payments so long as their accumulation accounts contain sufficient value to cover the monthly deduction charges.

3. In the late 1980s and early 1990s, Transamerica sold hundreds of millions of dollars in universal life insurance policies under which it agreed to credit interest on policyholders' accounts at guaranteed annual rates generally ranging between 4.0% and 5.5% (the "Policy" or "Policies").[1] Plaintiffs and the other Class members (as defined below) purchased these Policies so that they and their families would be protected as they entered their senior years and in the event of death. However, beginning in August 2015, Transamerica suddenly, unilaterally, and massively began increasing monthly deductions withdrawn from the Policies' accumulation accounts, falsely stating the increases were permitted by the terms of the Policies. Despite its representations to policyholders, Transamerica's true reasons for imposing the drastic increases were to: (a) subsidize Transamerica's cost of meeting its interest rate guarantees under the Policies; (b) recoup past losses in violation of the terms of the Policies; and (c) induce Policy terminations by policyholders.

4. By violating its contractual duties, Transamerica was able to enrich itself at the expense of its policyholders, either by charging those policyholders higher premiums or higher costs, which often caused policyholders to be unable or unwilling to pay the higher costs. In those cases, Transamerica would also benefit because the Policies would lapse, eliminating Transamerica's exposure on the Policies while enabling Transamerica to keep for itself years' worth of the premiums the policyholders had already paid. Oftentimes, Transamerica did this just

---

[1] Plaintiffs are not alleging claims premised on deception at the time of sale of the Policies or any other pre-sale conduct by Transamerica. Instead, Plaintiffs' claims are exclusively premised on Transamerica's actions in imposing increased premiums and Monthly Deduction Rates beginning in August 2015.

as the policyholders were approaching the age when they most needed the Policies.

5.      To maximize the number of policyholders who would surrender their Policies and lose their life insurance coverage, Transamerica sent letters to policyholders directing them to contact a designated Transamerica hotline with any questions about the premium and Monthly Deduction Rate increases, rather than directing the policyholders to the agents with whom they had dealt for many years.  Transamerica also began to refuse to provide policyholders with illustrations showing how their Policies will perform as a result of the increases.  Instead, Transamerica will only provide policy illustrations depicting how the Policies will perform if the Monthly Deduction Rates were raised to a level even higher than the rates Transamerica already impermissibly imposed.  By showing policyholders the most pessimistic Policy performance possible, Transamerica planned to induce policyholders to surrender their Policies, cynically anticipating that it would save tens of millions of dollars on a money-losing product—and evade paying tens of millions of dollars in death benefits—if it could "shock" a few thousand policyholders into giving up their policies.

6.      As a result of Transamerica's actions, thousands of Class members were and continue to be faced with either paying exorbitant and improper increases that cannot be justified by the ultimate death benefits of the Policies and that violate the Policies, or surrendering the Policies and walking away from years of premium payments.

7.      Because of the premium and cost of insurance deduction increases, policyholders were no longer receiving the insurance products for which they had bargained and paid.  The death benefits stated on their Policies were unchanged, but the cost of preserving that coverage had increased dramatically, and the investment benefit of the Policies had been sabotaged.  Maintaining their policies was neither feasible nor worthwhile for Plaintiffs Fairlie and Wright, and thousands

3

of other policyholders. Their policies lapsed (or will soon lapse) as a result of the improper increases, and they forfeited to Transamerica tens or hundreds of thousands of dollars' worth of life insurance coverage. Transamerica achieved its improper shock lapse objective.

8. As described more fully below, Transamerica's sudden and unilateral increase in the Monthly Deduction charges and premium increases breached its contractual obligations. Plaintiffs seek injunctive and equitable relief, as well as ancillary damages, to halt and reverse Transamerica's massive increase in the Monthly Deductions that are withdrawn from its policyholders' accounts. This increase has already injured Plaintiffs and other Class members, and if allowed to proceed, will continue to cause irreparable injury to Plaintiffs and other Class members.

## **THE PARTIES**

9. Suzanne F. Fairlie is, and was at all relevant times, a resident of Pennsylvania. In January of 1985, Transamerica Occidental Life Insurance Company ("Transamerica Occidental") issued Fairlie, as the owner and insured, a universal life insurance policy with a face amount of $250,000.00 (Policy No. 92309935). Fairlie's policy was subject to the Monthly Deduction and premium increases imposed by Transamerica beginning in November 2016. The Monthly Deductions and premium increases negated the value of the Policy, and, as a result, Fairlie stopped making premium payments in January 2018.

10. Odis J. Wright is, and was at all relevant times, a resident of California. In August 1998, Monumental Life Insurance Company issued Wright a universal life insurance policy with a face amount of $50,000 (Policy No. MM3356058). Wright's policy was subject to the Monthly Deduction and premium increases imposed by Transamerica beginning in February 2015. The monthly deductions and premium increases negated the value of the Policy, and, as a result,

4

Wright's policy lapsed in late 2017.

11.     Defendant Transamerica Life is a corporation organized under Iowa law, with its principal place of business located at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499.

12.     On or about October 1, 2008, Transamerica Occidental was merged into Transamerica Life, making Transamerica Life its successor-in-interest.

13.     Defendant Transamerica Premier is a corporation organized under Iowa law, with its principal place of business located at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499.

14.     Effective July 31, 2014, Monumental Life Insurance Company, which had been a Transamerica company, changed its name to Transamerica Premier Life Insurance Company. This was a rebranding that did not affect the Polices of those insured by Monumental.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Fairlie is a citizen of Pennsylvania, Wright is a citizen of California, and Defendants are citizens of Iowa. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members in the proposed Classes.

16.     This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct business in Iowa, are doing business in Iowa, are registered with the Iowa Secretary of State, and maintain registered agents in Iowa. Alternatively, Defendants are engaged in systematic and continuous business activity in Iowa, have sufficient minimum contacts in Iowa, or otherwise intentionally avail themselves of the Iowa consumer market through the promotion, marketing, distribution, and sale of life insurance policies, including the universal life insurance policies at issue in this case. That purposeful availment renders the exercise of jurisdiction by this Court over Defendants appropriate under traditional notions of fair play and substantial justice.

5

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Defendants regularly conduct business and maintain substantial operations in this District; hundreds, if not thousands, of Class members reside in this District; a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this District; and Defendants entered into transactions and received substantial profits in this District.

18.     All conditions precedent to this action have occurred, been performed, or have been waived.

**FACTUAL ALLEGATIONS**

A.     **Universal Life Insurance Policies**

19.     Traditionally, life insurance companies sold two types of policies: term and whole life insurance.  Term life insurance is issued for a term of years, normally building up no cash value and expiring without value.  Whole life insurance provides coverage for life and provides an increasing cash value that is available when needed.  The premiums remain the same throughout the life of the Policy.

20.     Universal life insurance, on the other hand, provides more flexibility than whole or term life insurance.  Premium payments, which are variable, are deposited in an accumulation account from which monthly cost of insurance and expense charges are deducted.  The accumulation account is credited with monthly interest at a nonguaranteed declared rate, but not less than the guaranteed interest rate specified in the Policy contract.  Universal life insurance policies allow policyholders to change the amount and frequency of premium payments as long as their policies contain sufficient cash value to cover monthly deductions taken.[2]

---

[2] *Universal Life Insurance*, Transamerica,
https://www.transamerica.com/individual/products/insurance/universal-life/ (last visited Mar. 27, 2018).

6

21.     In 1981, major life insurance companies entered into the universal life insurance market, and by the end of 1983, virtually all major insurers had introduced at least one universal life product.[3] Universal life policies accounted for more than 25% of all individual life-insurance sales for much of the 1980s, when 10-year Treasury yields peaked at 15%.[4]

22.     Consumers in the 1980s and 1990s were attracted to universal life policies because of the historically high interest rates. Calculated premiums were based on optimistic interest rate assumptions, most of them guaranteeing at least 4%. High interest rates meant that policyholders did not expect to pay much to fund the Policies in their more senior years because the interest would cover future expenses.

23.     Today interest rates are near an all-time low, making it difficult for insurers to credit the rates the insurers promised when they sold the Policies twenty years ago. As a result, insurance companies are suffering losses due to these universal life insurance policies, and their attempt to fix the problem consists of impermissibly raising the cost of insurance ("COI") charges.

24.     Transamerica's Policies use the term "monthly deduction" to refer to the Cost of Insurance ("COI") charge. This charge is important to universal life policyholders for at least two reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the accumulation account (i.e., the savings component) of the Policy, so the policyholder forfeits the COI charge entirely to Transamerica. Transamerica's recent COI increases range from 11% to over 100%, making it impossible for policyholders—especially those

---

[3] Douglas C. Doll, *A Brief History of Universal Life*, Society of Actuaries, (Jan. 1999), https://www.soa.org/News-and-Publications/Publications-Browse/Monographs/1999/1999-01-A-Brief-History-of-Universal-Life.aspx.
[4] Leslie Scism, *Retirees Stung by "Universal Life" Cost*, Wall Street Journal (Aug. 9, 2015), http://www.wsj.com/articles/cost-of-universal-life-insurance-stings-retirees-1439172119.

at retirement age—to afford their payments and to keep the Policies in effect.

**B.    Transamerica's Standardized Policy Terms**

25.    Plaintiffs bring this Class action on behalf of themselves and other owners and former owners of universal life insurance Policies issued and administered by Defendants.[5]  The Policies use standardized, materially uniform language with respect to the Policy provisions at issue in this action.

26.    Under the uniform provisions of the Policies, an "accumulation account" is established for each Policy, into which the policyholder's premium payment(s) are deposited.  The accumulation account earns interest at a declared interest rate not less than the guaranteed interest rate specified in the Policy.  Certain Policies provide that Transamerica will pay guaranteed interest at the rate of 4%, and that the accumulation value on any Policy anniversary will never be less than as if 5.5% interest were credited annually from the issue date.  Other Policies contain similar interest rate guarantees.

27.    At the end of each Policy month, Transamerica withdraws a Monthly Deduction from the Policy's accumulation account.  The Monthly Deduction is equal to the following: (a) the application of a "Monthly Deduction Rate" to the difference between the death benefit and the accumulation value at the beginning of the year; (b) the monthly deduction for any Policy riders; and (c) a Policy fee.

28.    The Monthly Deduction Rate is by far the most important component of the Monthly Deduction charge.  Even small changes in the Monthly Deduction Rate can produce a dramatic increase in the dollar amount of the Monthly Deduction charged by Transamerica, particularly for

---

[5] The Policies include policies issued by Transamerica that share comparable terms and for which Transamerica has unilaterally increased monthly deductions since August 1, 2015.

8

elderly insureds. The higher the Monthly Deduction Rate, the greater the premiums required to maintain a positive balance in the accumulation account and avoid a lapse of the Policy.

29. Under the Policies, Transamerica determines the Monthly Deduction Rates for each Policy year at the beginning of the year, using the insured's age as of that Policy year. The guaranteed Monthly Deduction Rate for non-smokers is premised on a COI portion or component, which is in turn based on projections of life span established by the 1980 Commissioner's Standard Ordinary ("CSO") Mortality Tables. The guaranteed Monthly Deduction Rate for smokers is premised on the same COI rates, plus an added "expense" portion or component.

30. Under the Policies, Transamerica's discretion to set or increase the Monthly Deduction Rates is therefore constrained by the Tables of Guaranteed Monthly Deduction Rates and the attained age of the insured under the Policy. Furthermore, the Policies do not authorize Transamerica to do any of the following:

- Set or increase the Monthly Deduction Rates in whatever amount or by whatever method it determines;

- Set or increase Monthly Deduction Rates to recoup past losses, including past losses on the Policies based on changes in interest rates, Policy lapse rates, or other experience factors;

- Set or increase Monthly Deduction Rates to recoup losses due to diminished returns on Transamerica's general investment portfolio; and

- Set or increase Monthly Deduction Rates in order to negate or offset Transamerica's obligation to pay credited interest to the Policies at the minimum guaranteed rates.

31. A reasonable policyholder would construe the standardized Policy language to mean that the Monthly Deduction Rate, which is premised on the purported COI and the 1980 CSO Mortality Tables, would not change except for a verifiable, material adverse change in the underlying mortality rates used to price the Policies. As reflected in every subsequent version of

9

the CSO Mortality Tables, mortality rates have only improved in the years since the Policies were issued.

32.     A reasonable policyholder would also construe (1) the Policies' provisions governing the payment of guaranteed interest on the accumulation account, and (2) the Policies' provisions governing the Monthly Deduction based on Transamerica's COI, as operating independently of one another, thereby precluding Transamerica from offsetting or subsidizing its interest obligations through increases in the Monthly Deduction Rate.

33.     In the alternative, the Policies are at a minimum ambiguous with respect to whether Transamerica can increase the Monthly Deduction for any reason other than an adverse change in the pricing mortality rates.  As a result, any ambiguity in that respect must be construed against Transamerica and in favor of the policyholders.

**C.     Transamerica's Massive Monthly Deduction Rate and Premium Increases**

34.     Beginning in or about June 2015, Transamerica suddenly announced it was going to unilaterally increase Monthly Deduction charges under the Policies by as much as 100% based on a substantial increase in the Monthly Deduction Rate.

35.     Transamerica notified Policyholders of the Monthly Deduction Rate increase through a uniform letter. In the letter, Transamerica purported to explain "What's Changing and Why."  Transamerica misrepresented that the Monthly Deduction Rate increase was permitted under the limited grounds authorized by the Policies, stating it was increasing the Monthly Deduction Rates "based on our current expectations regarding future costs of providing . . . coverage [for the Policies]."

36.     Transamerica thus acknowledged the limited grounds upon which the Policies permit a Monthly Deduction Rate increase, and represented that the Monthly Deduction Rate

increase was premised on an adverse change in the COI portion of the Monthly Deduction Rate. Transamerica did not give any other explanation for the Monthly Deduction Rate increase in the notice letter.

37. Transamerica imposed Monthly Deduction Rate increases, resulting in a substantial increase in the amount taken from policyholders' accumulation accounts upon the respective Policy's anniversary dates, as well as in the premiums necessary to maintain coverage under the Policies.

38. For example, beginning in November 2016, Transamerica Life vastly raised Fairlie's Monthly Deduction Rate on multiple occasions, including (i) an increase from $311.71 to $418.78 in November 2016; (ii) an increase in March 2017 to $466.99; (iii) and a recent increase in February 2018 to $519.97. Over the course of two years, Fairlie's Monthly Deduction Rate has increased by 67%. As a result of Transamerica's astronomical increases to the Monthly Deduction Rates (which promised only to increase even more), Fairlie stopped making any further payments on her policy after having dutifully paid her premiums for decades.

39. Likewise, Transamerica Premier vastly raised Wright's Monthly Deduction Rates. Beginning in 2015, Transamerica Premier raised Wright's Monthly Deduction Rates so much that Transamerica Premier contacted him quarterly and indicated that on top of his $128 monthly premium—which used to cover the cost of insurance—he would need to pay more than $400 for the quarter. As recently as September 2017, Transamerica Premier contacted Wright demanding that he pay $500 in addition to his timely paid monthly premiums. As a result of Transamerica's astronomical increases to the Monthly Deduction Rates (which promised only to increase even more), Wright's policy lapsed after Wright had dutifully paid his premiums for decades.

40. Because of these increases and the threat of further increases, Plaintiffs were not

able to afford paying for coverage at all, resulting in (or which will result in) their Policies lapsing despite decades of dutifully paying premiums. The annual increase in premiums and Monthly Deduction Rate increases has been staggering, particularly for retirement-age policyholders living on a fixed income to support themselves.

41. Defendants' increases are not attributable to a verifiable, material adverse change in underlying mortality rates as required by the Policies, but rather to Transamerica's impermissible effort to recoup prior losses, offset its interest expense, and to cause policyholders to surrender or lapse on their Policies. Plaintiffs have been and continue to be damaged by Transamerica's unjustifiable Monthly Deduction Rate increases.

42. Plaintiffs and the other Class members have decided to give up valuable policies after being required to pay much higher premiums to maintain the same level of coverage such that their Policies became cost-prohibitive. Unless stopped, Transamerica will induce even more policyholders to surrender their Policies. These widespread terminations—also known as "shock lapses"—will benefit Transamerica because it will not have to pay out the death benefits on Policies for which Plaintiffs and Class members have dutifully paid the premiums for years or decades.

**D.    Transamerica's True Reasons for the Monthly Deduction Rate Increase**

43. The sudden and dramatic Monthly Deduction Rate increase is not truly based on adverse changes in the "cost of providing coverage" as Transamerica represented in its notice letter to the policyholders, but rather is based on Transamerica's desire to avoid its contractual obligation to meet the high interest crediting rates it had promised under the Policies and to recoup past losses.

**1.    The Genesis of Transamerica's Self-Inflicted Losses**

44. As alleged above, over the last twenty to thirty years, Transamerica has collected

premiums from policyholders premised on Monthly Deduction Rates expressly tied to mortality-based cost of insurance charges. Transamerica now seeks to impose the draconian Monthly Deduction Rate increase to impermissibly recoup past losses even though mortality has only improved over the years.

45. Insurance carriers must reserve assets for the payment of liabilities on the Policies they issue. Typically, as much as 80% of an insurance carrier's assets are held in corporate bonds, which support the reserves required to back its contractual obligations to policyholders. At the time the Policies were issued, interest rates were at historically high levels. As interest rates started to trend downwards beginning in the early 2000s, the bonds acquired by Transamerica in earlier years increased in value. However, Transamerica could not sell the bonds supporting its policy reserves and realize the associated gains unless the underlying policy liabilities were released, which occurs when policies are surrendered or lapse. Transamerica's reserves included those backing the Policies, thereby ensuring that Transamerica had sufficient future profits to pay its obligations to Plaintiffs and Class members as those obligations became due.

46. Both Transamerica Defendants' ultimate parent is AEGON NV ("AEGON"), a publicly traded Netherlands-based corporation. Because the Policies and other interest sensitive insurance products sold by Transamerica were not lapsing quickly enough to allow the company to release reserves and free up enough capital to satisfy AEGON's demand for cash-flows, Transamerica engineered a series of captive reinsurance transactions premised on representations to regulators and the public that it was holding reserves that were more than sufficient to cover its liabilities, including its obligations under the Policies, based on existing and anticipated future monthly deduction charges and related expenses. Through such "shadow insurance" transactions, Transamerica purported to transfer the risks associated with the Policies and other interest-

13

sensitive products to wholly-owned captive reinsurance affiliates, thereby claiming a "reserve credit" and allowing Transamerica to release the purportedly redundant reserves into its reported surplus, which it then used to pay dividends to AEGON.

47. For example, in 2010, Transamerica reported that it had taken reserve credits as a result of reinsurance transactions with affiliated reinsurance companies totaling approximately $30 billion. Transamerica purported to justify these transactions based on its assertion that Transamerica had ample remaining reserves to cover its liabilities, including its obligations under the Policies. In 2010 alone, Transamerica and other affiliated insurance operating companies upstreamed dividends to AEGON totaling $2.3 billion.

48. By releasing the reserves through captive reinsurance transactions in order to upstream billions of dollars to its parent, Transamerica weakened its policy reserves, diverted its cash flows to pay parental dividends and depleted its capital, thereby self-inflicting near-term losses that it would later seek to recoup through the Monthly Deduction Rate increase. By depleting its capital surplus to benefit its foreign parent at the expense of its policyholders, Transamerica knowingly increased the potential adverse impact of losses stemming from the Policies' high interest rate guarantees and other financial reversals. Even though Transamerica assumed those risks by entering into the Policy contracts containing high guaranteed interest rates and provisions prohibiting Transamerica from recouping losses through Monthly Deduction Rate increases, Transamerica nevertheless imposed the Monthly Deduction Rate increase in contravention of its contractual obligations to the policyholders.

### 2. Transamerica Imposes the Monthly Deduction Rate Increase to Recoup Losses Resulting from Its Captive Reinsurance Transactions and the Great Recession

49. Interest rates have declined over the last fifteen years, falling to historic lows in the

14

wake of the Great Recession. Although these steadily declining interest rates, which fell sharply during the Great Recession, have adversely impacted insurers generally, they have had extremely adverse consequences for the profitability of products, like the Policies issued by Transamerica, which have high guaranteed interest rates.

50. In the late 1980s, when many of the Policies were issued, the 10-year Treasury rate was around 9%. Throughout the 1990s the 10-year Treasury moved steadily downwards, remaining at or above 5% until the post-2001 recession period when it pierced the 4% level for some months. Between 2003 and 2008 it fluctuated generally between 4% and 5%. Since mid-2008, however, the 10-year Treasury has been under 4%, hitting a low of 1.65% in 2012. In April 2012, the Center for Insurance Policy & Research ("CIPR") branch of the National Association of Insurance Commissioners published a report describing the effect on insurers of what was, even then, a prolonged period of low level interest rates. The CIPR Report warned:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities. For life insurance companies, their assets and liabilities are heavily exposed to interest rate movements. Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness. Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered. Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .

> Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies. During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.
> ***

> In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%). For many policies, low interest rates mean that some mismatch with assets is likely. For

15

example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields—are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

51.    The low interest rate environment has persisted since 2012, exacerbating the spread compression and thus, as explained by the CIPR, undermining the profitability of policies that "guarantee rates around 6%."

52.    A recent report by actuary and Consumer Federation of America's James H. Hunt described how today's "climate of low interest rates" would impact insurers.[6]  For more than thirty years Hunt has evaluated life insurance policies.  His report prophetically warned:

While there have been occasional COI increases in the past, and there has been litigation on the issue, CFA is concerned that the actions taken may spread throughout the life insurance business . . . . We are concerned that COI rate increases will, in effect, void the interest rate guarantees in affected contracts.  The question is: Are these insurers in a climate of low interest rates using COI increases to maintain profits when the interest rates they have been crediting to cash values have been reduced to the contractually guaranteed rates, often 4%, sometimes higher?

Id. at 1.

53.    As Hunt predicted, the low interest rate environment undermined the profitability of policies with guaranteed rates at 4% or more, and in turn Transamerica is "using COI increases to maintain profits."  In fact, Transamerica's investment returns have been very low since 2007, and are nowhere near the returns needed to support interest credit to the Policies' cash values at

---

[6] *See* James H. Hunt, *Life Insurance Regulators Should Block Cost of Insurance Rate Increases When Used to Avoid Guaranteed Interest Rates in Universal Life Policies*, Consumer Federation of America, https://www.consumerfed.org/pdfs/160121_CFACOIs_report.pdf (last visited Mar. 27, 2018).

the guaranteed 4% rate.

54.    Through the Monthly Deduction Rate increase, Transamerica is seeking to offset or subsidize its credited interest guarantees through dramatic increases in the charges taken from the policyholders' cash value.  Transamerica is also seeking to recoup past losses through the Monthly Deduction Rate increase.  In short, through the sudden and massive Monthly Deduction Rate increase, Transamerica is attempting to avoid its obligation to credit the guaranteed interest rates under the Policies by impermissibly recouping its past losses—thereby denying policyholders their contractual benefits under the Policies.  Transamerica is impermissibly attempting to offset or subsidize its credited interest guarantees.

55.    For the foregoing reasons, Transamerica's purported reason for the Monthly Deduction Rate increase was false.  As one industry commentator has put it, Transamerica is "trying to claim that mortality charges are the culprit even though you would have to be snoozing pretty heavily not to know that people are living way longer than they were 15 to 20 years ago."[7]

56.    Because non-guaranteed elements such as the Monthly Deduction Rate are required to reflect expectations of future experience, Transamerica is precluded from re-determining those elements to recoup past losses, including past losses attributable to the Policies.  Not only do the Policies contain contractual provisions prohibiting Transamerica from increasing the Monthly Deduction Rates to recoup past losses, any attempt to do so would violate the actuarial standards of practice, the code of professional ethics, and regulatory constraints.

---

[7] Ed Hinerman, *Transamerica Life Drops a Big One in the Punch Bowl!*, Hinerman Group, (June 8, 2015), http://www.hinermangroup.com/blog/insurance/transamerica-life-drops-a-big-one-in-the-punch-bowl.

17

### 3. The Monthly Deduction Rate Increase Is Not Justified by Adverse Anticipated Experience Factors Relating to the Cost of Insurance

57.     The Monthly Deduction Rate increase is not justified by adverse mortality or any other deterioration in anticipated experience factors relating to the expected future cost of insurance, which is the only permissible basis for changes in the Monthly Deduction Rates under the Policies.  The Monthly Deduction Rate, which Transamerica has set at a level less than the Guaranteed Monthly Deduction Rate, is considered a "non-guaranteed element" of the Policy.

58.     Insurance companies and their actuaries are required to file with their state regulators answers to interrogatories every year as to whether their "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience."

59.     Transamerica consistently reported to regulators that the anticipated experience factors underlying its nonguaranteed elements were no different from current experience.

60.     Transamerica qualified its Statement of Nonguaranteed Elements to "include [] only those elements over which the company . . . may by policy provisions exercise some current or future level of discretionary control," while excluding from its statement "interest sensitive . . . contracts [that] contain minimum interest rate . . . guarantees . . . which the company must, as a matter of contract law, not violate."  *Id.*  Transamerica also disclaimed any ability to predict anticipated investment experience.  By doing so, Transamerica avoided disclosing that the high interest rates guaranteed in the Policies were not supported by current experience and, in fact, had contributed to losses that Transamerica improperly now seeks to recoup through the Monthly Deduction Rate increase.

61.     Insurance company actuaries are required to closely monitor and report on COI trends affecting non-guaranteed elements of its insurance policies.  Material deviations between current and expected future expectations as to COI do not occur overnight; they are gradual trends

for which actuaries can and do make incremental adjustments. As a consequence, it is inconceivable that the Monthly Deduction Rate increase (as high as 100%) is attributable to changes in current or anticipated experience factors relating to the cost of providing insurance that emerged over the course of less than two years.

62. Likewise, to the extent that the Policies permitted Defendants to consider interest rates as a future cost factor in determining its Monthly Deduction Rate, it is widely understood that interest rates have bottomed out and will slowly continue to rise over the next several years. Thus, Defendants' future costs related to interest do not support an increase in the Monthly Deduction Rate and go only to show that Defendants are seeking to recoup past losses.

### 4. Transamerica Seeks to Inflict Massive Shock Lapses through the Monthly Deduction and Premium Increases

63. As alleged above, Transamerica has saddled Plaintiffs and other Class members with the onerous Monthly Deduction Rate increase not because of any adverse mortality experience or other legitimate COI factors but, instead, to defray its contractual obligations to pay guaranteed interest under the Policies and to recoup losses stemming from Transamerica's own actions, including arranging captive reinsurance transactions to release policy reserves for the purpose of upstreaming billions of dollars in dividends to AEGON. In an unconscionable disregard of the rights and interests of its—mostly elderly—policyholders, Transamerica effectively plundered the Policy reserves established to protect those policyholders, only to turn around and demand that the policyholders themselves restore the profitability of the Policies to Transamerica by paying increased monthly deductions.

64. As a Netherlands-based holding company, AEGON is subject to the capital adequacy requirements of the European Union, known as "Solvency II". On Friday, June 12, 2015, the European Commission issued a decision permitting AEGON and other European based

insurance companies to include the capital of their foreign subsidiaries in determining their own risk-based capital under the operative capital adequacy requirements. This decision thus allowed AEGON to include the earnings and capital of Transamerica to satisfy its own risk-based capital requirements. Transamerica announced a Monthly Deduction Rate increase on Monday, June 15, 2015, the very next business day after the European Commission's decision.

65. The Monthly Deduction Rate increase, which was implemented to recoup Transamerica's past losses and offset its interest obligations, was therefore calculated to benefit AEGON by allowing AEGON to include the resulting profits in order to help satisfy its own minimum risk-based capital requirements under the European Union capital adequacy regime. Indeed, according to an equity research report by RBC Capital Markets dated August 18, 2015, AEGON is now entirely dependent on the cash flow generated by Transamerica (including the cash flows resulting from the Monthly Deduction Rate increase) to cover AEGON's dividends and expenses. Furthermore, AEGON's ability to continue dividends at their current level would be jeopardized if Transamerica were required to reestablish the reserves that were released as part of the captive reinsurance transactions described above.

66. Defendants' Monthly Deduction Rate increases virtually assure that Transamerica will achieve its goal of recouping past losses, offsetting its interest obligations, and causing "shock lapses." To the extent policyholders agree to pay the increased charges resulting from the Monthly Deduction Rate increase, Transamerica will avoid its losses and reap profits. To the extent policyholders decide or are forced to surrender their Policies as a result of the Monthly Deduction Rate increase, Transamerica will wipe the unprofitable Policies from its books. Transamerica knows, and fully expects, that the massive Monthly Deduction Rate increase will cause thousands of people to surrender their Policies and cause thousands of other Policies to lapse as the increased

20

Monthly Deduction charges exhaust the funds in the Policies' accumulation accounts. Indeed, Transamerica has acted intentionally to provoke Policy surrenders in an effort to wipe from its books life insurance Policies that Transamerica has by its own conduct rendered unprofitable.

67.     The likelihood of a surrender or lapse increases dramatically when there is an increase in Monthly Deduction Rates, and the policyholder must decide whether he or she can afford to maintain the Policy, especially when the information supplied to the policyholder is deliberately designed to provoke surrender or lapse.

68.     Transamerica has actively sought to encourage and provoke Plaintiffs and other Class members to terminate their Policies or reduce the face amount of coverage enough to allow Transamerica to collect the increased monthly deduction charges. In its form letters announcing the Monthly Deduction Rate increase, Transamerica suggested as the first option that policyholders "may choose to surrender your policy for the cash value . . . . You can take this in cash or you may be able to exchange it for another life insurance policy that accumulates cash value." Transamerica also suggested an alternative "Reduced Face Amount Option," which would drastically reduce the insurance coverage while still allowing Transamerica to pocket the increased Monthly Deductions as long as the Policy remained in force.

69.     Transamerica also has created obstacles that preclude policyholders from obtaining the information they need to evaluate their options. For instance, Transamerica systematically directs policyholders to speak with its "customer service" representatives or its "Product Specialist Team" to obtain information and answers to questions about the Monthly Deduction Rate increase. Policyholders often must make multiple calls or remain on hold for extended periods of time to contact the Transamerica representatives. Moreover, policyholders are often given confusing or conflicting answers to their questions, or presented with alarming doomsday scenarios intended to

encourage surrenders or lapses.

70.    In addition, Transamerica is now refusing to provide policyholders with illustrations showing how their Policies will perform as a result of the Monthly Deduction Rate increase. Instead, Transamerica will now only provide policy illustrations depicting how the Policies would perform if the Monthly Deduction Rates were raised to a level even higher than the rates imposed by the Monthly Deduction Rate increases. These illustrations depict the most pessimistic scenario possible, suggesting the Policies will terminate far sooner than they originally would have as a result of the Monthly Deduction Rate increases. By doing so, Transamerica hopes to induce policyholders to surrender their Policies.

### 5.    Transamerica's Unconscionable Conduct Must Be Enjoined

71.    Through the sudden and massive Monthly Deduction Rate increase, Transamerica is attempting to avoid its obligation to credit the guaranteed interest rates under the Policies, and is attempting to recoup past losses and shed the Policies by making the premiums to maintain them cost-prohibitive for policyholders, thereby frustrating policyholders' ability to receive their contractual benefits under the Policies.

72.    The Class members hardest hit by Transamerica's unconscionable business practice are elderly policyholders who have dutifully paid premiums for twenty years or more based on the expectation that in their twilight years the Policies would provide protection for their families. Due to age-related underwriting considerations, life insurance protection for these elderly policyholders is now either unavailable or prohibitively expensive. Compounding this situation is the fact that these Policies do not contain an "extension of maturity option" which would provide coverage past age 100. Therefore, it is possible that the insured may outlive the Policy and will have paid increased premiums without a way to recover the additional costs. Transamerica's

actions have thus stripped Plaintiffs and the proposed Class of any future life insurance protection.

73. Transamerica's successful attempt to deprive Plaintiffs and Class members of the primary benefit of their Policies—paid for through years of contributions to the accumulation account—violates Transamerica's express and implied obligations under the Policies. The vast majority of Transamerica policyholders affected by this increased COI are elderly, many are now in their mid-to-late eighties and nineties and purchased a Policy in the 1990s when they were in their sixties or seventies. These policyholders have faithfully paid the scheduled premiums for years and have accumulated significant cash value in the Policies. Due to their advanced age, these individuals cannot obtain alternative life insurance coverage and will lose the cash value of the Policy if they cannot pay the increased costs to maintain the Policy.

74. Transamerica for many years and as recently as late 2015, supplied policyholders with illustrations and other information using existing COI rates that provided no hint of any impending change in those rates. Current policyholders thus had no way of knowing or expecting that this dramatic increase in the Monthly Deduction Rates would happen after almost twenty years of stable premiums.

75. These elderly policyholders, who are effectively uninsurable due to their advanced age, face the prospect of: (1) surrendering their Policies and losing their death benefits at an age when purchasing other life insurance coverage is practically impossible; (2) permitting Transamerica to deplete their Policy values through its "cost of insurance" increases until there is nothing left and the Policy "shock lapses"; (3) paying vastly increased premiums with no assurance the cost of insurance will not continue to increase; or (4) accepting cuts in death benefits.

76. As a result of Transamerica's actions, thousands of policyholders are faced with the difficult decision of either paying the exorbitant and unjustified new charges, or forever forgoing

23

the life insurance benefits for which they have dutifully paid premiums for many years.

77.     Plaintiffs seek permanent declaratory and injunctive relief requiring Transamerica to (i) reverse the unlawful Monthly Deduction Rate increases charged on the Policies, and (ii) reinstate all Policies that were surrendered or lapsed as a result of the Monthly Deduction Rate increase.  Plaintiffs also seek ancillary damages flowing directly from Transamerica's unlawful conduct.

## CLASS ACTION ALLEGATIONS

78.     This action is brought by Plaintiffs individually and on behalf of the Class and subclasses described below (the "Classes") pursuant to Rule 23, subdivisions (a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

79.     Plaintiffs seek certification of the following Classes:

> **National Class**
> All persons who, at the time of certification, previously owned a Transamerica Life or Transamerica Premier Universal Life Insurance Policy for which (i) the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, resulted or threatened to result in higher Monthly Deduction charges than those applicable under the rate schedule in effect before that date; and (ii) that terminated after that date.

> **California Subclass I**
> All California residents who, at the time of certification, previously owned a Transamerica Life or Transamerica Premier Universal Life Insurance Policy for which (i) the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, resulted or threatened to result in higher Monthly Deduction charges than those applicable under the rate schedule in effect before that date; and (ii) that terminated after that date.

> **California Subclass II**
> All California residents who, at the time of certification, were 65 years or older and previously owned a Transamerica Life or Transamerica Premier Universal Life Insurance Policy for which (i) the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, resulted or threatened to result in higher

Monthly Deduction charges than those applicable under the rate schedule in effect before that date; and (ii) that terminated after that date.

**<u>Pennsylvania Subclass</u>**
All Pennsylvania residents who, at the time of certification, previously owned a Transamerica Life or Transamerica Premier Universal Life Insurance Policy for which (i) the Monthly Deduction increase imposed by Transamerica beginning August 1, 2015, resulted or threatened to result in higher Monthly Deduction charges than those applicable under the rate schedule in effect before that date; and (ii) that terminated after that date.

80.     Excluded from the Classes are (1) any Judge or Magistrate Judge presiding over this action and their family members; (2) Transamerica, and its corporate parents, subsidiaries and affiliates, officers and directors, and any entity in which Transamerica has a controlling interest; (3) persons who properly and timely request to be excluded; and (4) the legal representatives, successors, or assigns of any such excluded persons or entities.

81.     There are hundreds, if not thousands, of members of the Classes described in the foregoing paragraph.  Accordingly, joinder of all members is impracticable.  Although the exact number of members is unknown to Plaintiffs at this time, the identities and addresses of the members of the Classes can be readily determined from business records maintained by Transamerica.

82.     Plaintiffs' claims are typical to those belonging to Class members.  Plaintiffs' claims stem from Transamerica's impermissible premium and monthly deduction increases.

83.     Plaintiffs will also fairly and adequately protect the interests of the Class members, and have retained counsel experienced in complex class action litigation.  Plaintiffs and their counsel have no interests which are adverse to those belonging to the Class members that they seek to represent.

25

### A. Rule 23(b)(1)

84. Class action status is warranted under Rule 23(b)(1)(A). The prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

85. Class action status is also warranted under Rule 23(b)(1)(B). The prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

### B. Rule 23(b)(2)

86. This action is appropriate as a class action pursuant to Rule 23(b)(2). Plaintiffs seek injunctive relief and corresponding declaratory relief for the Class. Transamerica has acted in a manner generally applicable to each member of the Class by imposing the Monthly Deduction and premium increases on all Policies owned by Class members.

87. Transamerica's unlawful Monthly Deduction Rate increases caused members of the Class to forgo the benefits of insurance policies they had paid into for years or decades. If Transamerica is not enjoined and Plaintiffs' and the Class's policies are not reinstated, Plaintiffs and Class members will be subject to a substantial risk of irreparable harm.

### C. Rule 23(b)(3)

88. This action is also appropriate as a class action pursuant to Rule 23(b)(3). Common questions of law and fact predominate over any individualized questions. Common legal and factual questions include the following:

26

a.    Whether Transamerica's large and sudden increase in the Monthly Deduction Rates is authorized under the terms of the Policies;

b.    Whether Transamerica breached its contractual obligations owed to Plaintiffs and Class members;

c.    Whether Transamerica breached its implied duty of good faith and fair dealing owed to Plaintiffs and Class members;

f.    Whether Plaintiffs and Class members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

g.    Whether Plaintiffs and Class members are entitled to declaratory relief; and

h.    Whether Plaintiffs and Class members are entitled to preliminary or permanent injunctive relief, or other equitable relief, against Transamerica.

89.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a.    Given the age of Class members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Transamerica has committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

b.    Once Transamerica's liability has been adjudicated respecting the Monthly Deduction Rate increase, claims of all Class members can be determined by the Court;

c.    This action will ensure an orderly and expeditious administration of the Classes' claims and foster economies of time, effort, and expense, and ensure uniformity of decisions and compliance by Transamerica with the Policies;

d.    Without a class action, many Class members would continue to suffer injury, and Transamerica's violations of law will continue without redress while it continues to reap and retain the substantial proceeds derived from its wrongful conduct; and

e.    This action does not present any undue difficulties that would impede its management by the Court as a class action.

90.    A class action is superior to other available means for the fair and efficient adjudication of this controversy for other reasons as well. The injuries suffered by individual Class

members are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address Transamerica's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

91. Plaintiffs cannot be certain of the form and manner of proposed notice to Class members until the Class is finally defined and discovery is completed regarding the identity of Class members. Plaintiffs anticipate, however, that notice by mail will be given to Class members who can be identified specifically. In addition, notice may be published in appropriate publications, on the Internet, in press releases and in similar communications in a way that is targeted to reach Class members. The cost of notice, after class certification, trial, or settlement before trial, should be borne by Transamerica.

92. Plaintiffs reserve their right to modify or amend the definition of the proposed Classes at any time before the Classes are certified by the Court.

## FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

93. Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

94. Plaintiffs bring this claim on behalf of themselves and on behalf of the Classes.

95. The Policies are valid, enforceable contracts between Plaintiffs and other Class members and Transamerica.

96. At all relevant times, Plaintiffs and the Class members have paid premiums to

Transamerica through Monthly Deduction charges established at the inception of the Policies, and have otherwise performed all other obligations under the Policies.

97.    As alleged above, Transamerica owed duties and obligations to Plaintiffs and Class members under the Policies, including refraining from imposing Monthly Deduction Rate charges except as authorized under the terms of the Policies.  Through the Monthly Deduction Rate increase, Transamerica has materially breached the terms and provisions of the Policies for reasons not permitted under the Policies; that is, in order to reduce its credited interest obligations to Plaintiffs and the Classes and to recoup past losses, by dramatically depleting the Policyholders' accumulation accounts and forcing mass lapses and surrender of Policies.

98.    At a minimum, the Monthly Deduction Rate increase is of such a magnitude that, even if some legitimate factors were considered in increasing the cost of insurance, Transamerica must have considered impermissible factors in setting the level of the Monthly Deduction Rate increase.

99.    Transamerica's conduct and material breaches of the Policies have proximately caused damage to Plaintiffs and the Class members in an amount to be determined at trial.

100.  In addition, unless Transamerica is preliminarily and permanently enjoined from increasing its Monthly Deduction Rate charges for improper reasons and compelled to reinstate the Policies of Plaintiffs and the Class, Plaintiffs and the Class members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

<u>**SECOND CLAIM FOR RELIEF**</u>

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

101.  Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

29

102. Plaintiffs bring this claim on behalf of themselves and on behalf of the Classes.

103. The Policies are valid, enforceable contracts between Plaintiffs and other Class members and Transamerica.

104. Implied in each Policy is a contractual covenant of good faith and fair dealing through which Transamerica owed Plaintiffs and Class members a duty to act in good faith and deal fairly, and in a manner that did not frustrate their reasonable expectations under the Policies. Transamerica contractually breached the covenant of good faith and fair dealing because, to the extent Transamerica had the discretion to increase the Monthly Deduction Rate, that discretion was sufficiently constrained under the terms of the Policies to support an implied obligation of good faith and fair dealing with respect to the Monthly Deduction Rate increase.

105. Transamerica exercised its discretion under the Policies in bad faith and breached the implied covenant of good faith and fair dealing by, among other things:

    a. Exercising its discretion to increase the Monthly Deductions to recoup past losses;

    b. Misrepresenting to Plaintiffs and Class members the reasons for the Monthly Deduction Rate increase;

    c. Intending for the Monthly Deduction Rate increase to force Plaintiffs and Class members to surrender their Policies so Transamerica would not have to pay the death benefits; and

    d. Negating the value of what were intended to be guaranteed interest rates, which Transamerica has no right to do.

106. Transamerica's contractual breach of the covenant of good faith and fair dealing has proximately caused damage to Plaintiffs and the Class members in an amount to be determined at the time of trial.

107. In addition, unless Transamerica is ordered to reinstate the Policies of Plaintiffs and Class members and enjoined from continuing to deduct the unlawfully increased Monthly

Deduction charges, Plaintiffs and Class members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW (ON BEHALF OF CALIFORNIA SUBCLASS) AND PENNSYLVANIA'S UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION LAW (ON BEHALF OF THE PENNSYLVANIA SUBCLASS)

108.  Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

109.  Transamerica committed acts of unfair competition by engaging in, among others, the following practices:

a. Marketing and selling policies on the premise that they were a solid and good life insurance product that would provide a certain death benefit for a certain cost and duration and subsequently taking steps to prevent policy holders from receiving the promised benefits from those policies by suddenly, massively, and unlawfully increasing the cost of the Policies through Monthly Deduction Rate increases.

b. Imposing the Monthly Reduction Rate increases even though Transamerica's expected future mortality has improved and is better than the mortality upon which the original Monthly Deduction Rate schedule is based, and doing so in order to increase premiums, recoup past losses, and/or force its insureds to surrender their policies or allow their policies to lapse.  Defendants have done this in contravention of the express terms of the Policies.

c. After the sale of the Policies, continuing to send annual reports, policy servicing statements, illustrations and other documents and correspondence to Plaintiffs and Class members without disclosing that there would be sudden, dramatic, and cost-prohibitive increases in the Monthly Deduction charges.

d. Failing to provide any meaningful advance warning that Defendants intended to massively suddenly increase the Monthly Deduction Rates.

e. Ultimately providing a false and misleading explanation to Plaintiffs and the Class of the ground for the Monthly Deduction increase.

110.  A claim under California's Unfair Competition Law's ("UCL's") "unfair" prong is

predicated on a "business practice" that "violates established public policy" or is "immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *Eisen v. Porsche Cars N. America, Inc.*, No. CV 11-9405 CAS (FEMx), 2012 WL 841019, at *5 (C.D. Cal. Feb. 22, 2012) (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006). Transamerica violated the "unfair" prong by excessively raising the Monthly Deduction rates for reasons not authorized under the Policies, and unfairly shifting to Plaintiffs and Class Members: (a) losses suffered by Transamerica when the Policies ceased to be as profitable as Transamerica had hoped based on its original (but mistaken) pricing assumptions; and (b) Transamerica's cost of meeting its obligations to pay credited interest at the 4% annual and 5.5% effective guaranteed rates.

111. Under the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL"), "Unfair methods of competition" and "unfair or deceptive acts or practices" includes: "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made" and "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Pa. Stat. Ann. § 201-2 (West). By engaging in the widespread practices described above, Defendants have violated the UTPCPL.

112. The alleged unlawful and unfair practices alleged above are continuing and widespread practices engaged in by Defendants.

113. On behalf of the general public and the Classes, Plaintiffs respectfully request that the Court issue an injunction against Transamerica preliminarily and permanently enjoining it (i) from continuing to engage in unlawful and unfair conduct and preventing Transamerica from collecting the unlawfully and unfairly increased Monthly Deduction charges in violation of the

Policies and (ii) ordering any Policy to be reinstated that lapsed or terminated as a result of the Monthly Deduction increases.

114.   On behalf of the general public and the Classes, Plaintiffs furthermore respectfully request that this Court order restitution to be paid by Transamerica to the Classes for Monthly Deduction charges, premiums, and other amounts wrongfully required, obtained and collected as the result of the Monthly Deduction increases in violation of the Policies.

115.   Plaintiffs respectfully request an award of attorneys' fees as the prevailing party in this request for injunctive relief and restitution relief against Transamerica on behalf of themselves and the Class Members.

## FOURTH CLAIM FOR RELIEF

### ELDER ABUSE – VIOLATION OF CALIFORNIA'S WELFARE AND INSTITUTIONS CODE, SECTIONS, 15610, *et seq.* (ON BEHALF OF CALIFORNIA SUBCLASS)

116.   Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

117.   This cause of action is brought under California's Welfare and Institutions Code section 15610, *et seq.*

118.   Plaintiff Wright and members of the proposed California Subclass II, were sixty-five years or older at all times relevant to this claim.

119.   By imposing the Monthly Deduction increase, Transamerica took, depleted, appropriated and/or retained Wright's and Class members' personal property in bad faith for a wrongful use and/or with the intent to defraud, which constitutes financial abuse as defined in California Welfare & Institutions Code section 15610.30.

120.   Transamerica is guilty of oppression, fraud, and malice in the commission of the above-described acts of abuse.  At a minimum, Transamerica knew or should have known that its

33

conduct was likely to be harmful to elders.

121. Under California Civil Code section 3294, Transamerica is liable to Wright and the Class for punitive damages.

122. Under California Civil Code section 15657.5, Transamerica is liable to Wright and Class members over sixty-five for reasonable attorneys' fees and costs.

**DECLARATORY RELIEF**

123. Plaintiffs re-allege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

124. Plaintiffs bring this claim on behalf of themselves and on behalf of the Class.

125. An actual controversy has arisen and now exists between Plaintiffs and the Class members, on the one hand, and Transamerica, on the other hand, concerning the respective rights and duties of the parties under the Policies.

126. Transamerica contends that it lawfully and appropriately increased Monthly Deductions beginning in August 2015. On the other hand, Plaintiffs and Class members maintain that Transamerica, through its Monthly Deduction Rate and premium increases, has inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, collected inflated Monthly Deduction charges.

127. Plaintiffs, on behalf of themselves and the Class, seek a declaration as to the parties' respective rights under the Policies and request the Court to declare that the Monthly Deduction Rate increase is unlawful and in material breach of the Policies' terms so that future controversies may be avoided.

34

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray for relief as follows:

a) A judgment in favor of Plaintiffs and the Classes against Defendants on each count;

b) An order certifying this action to proceed on behalf of the Classes and appointing Plaintiffs and their counsel listed below to represent the Classes;

c) An order awarding Plaintiffs and Class members entitled to such relief, restitution and/or disgorgement and such other equitable relief as the Court deems proper;

d) An order enjoining Transamerica, its representatives, and all others acting with it or on its behalf from unlawfully charging excessive Monthly Deduction Rates for the Policies and requiring those rates to be at levels that are consistent with the terms of the Policies, and other appropriate injunctive relief;

e) An order providing preliminary and permanent injunctive relief enjoining Transamerica, its representatives, and all others acting with it or on its behalf, from terminating Policies while Transamerica imposes impermissible Monthly Deduction Rates;

f) An order providing preliminary and permanent injunctive relief requiring Transamerica, its representatives, and all others acting with it or on its behalf, to reinstate the Policy of Plaintiffs and any Class Member whose policy was cancelled or surrendered as a result of a Monthly Deduction Rate increase;

g) An order providing a declaration that the Monthly Deduction Rate increases materially breach the Policies, and that Transamerica must determine the Monthly Deduction Rates only on the grounds authorized under the Policies;

h) An order awarding Plaintiffs and other Class members who might be entitled to such relief actual, compensatory, statutory, punitive, and/or exemplary damages;

i) An order awarding Plaintiffs' attorneys' fees and other costs; and

j) An order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

35

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Plaintiffs and the Classes demand a trial by jury.

Dated: March 29, 2018                    Respectfully submitted,

By: */s/ Jenna L. Green*
    Jenna L. Green, AT0010606
    HUPY AND ABRAHAM, S.C., P.C.
    6600 Westown Parkway, Suite 270
    West Des Moines, Iowa 50266
    Telephone: (515) 984-0091
    Facsimile: (515) 777-3399
    Email: jgreen@hupy.com

By: */s/ Thomas W. Kyle*
    Thomas W. Kyle, AT0012891
    HUPY AND ABRAHAM, S.C., P.C.
    111 East Kilbourn Avenue, Suite 1100
    Milwaukee, WI 53202
    Telephone: (414) 223-4800
    Facsimile: (414) 469-0646
    Email: tkyle@hupy.com

By: */s/ Stephen J. Fearon, Jr.*
    Stephen J. Fearon, Jr (subject to *pro hac vice*)
    Raymond N. Barto (subject to *pro hac vice*)
    **SQUITIERI & FEARON, LLP**
    32 East 57th St., 12th Floor
    New York, New York 10022
    Telephone: (212) 421-6492
    Facsimile: (212) 421-6553
    Email: stephen@sfclasslaw.com
    Email: raymond@sfclasslaw.com

    **Attorneys for Plaintiffs and the Proposed Classes**