# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

SUZANNE FAIRLIE and ODIS
WRIGHT,

          Plaintiffs,

vs.

TRANSAMERICA LIFE INSURANCE
COMPANY and TRANSAMERICA
PREMIER LIFE INSURANCE
COMPANY,

          Defendants.

No. C18-32-LTS

**ORDER**

---

## I.  INTRODUCTION

This case is before me on a motion (Doc. No. 12) to dismiss by defendants Transamerica Life Insurance Company (Transamerica Life) and Transamerica Premier Life Insurance Company (Transamerica Premier) (together, Transamerica or defendants). Plaintiffs Suzanne Fairlie and Odis Wright have filed a resistance (Doc. No. 13) and Transamerica has replied (Doc. No. 18).  I find that oral argument is not necessary.  *See* N.D. Iowa L.R. 7(c).

## II.  PROCEDURAL HISTORY

On March 29, 2018, plaintiffs filed a purported class action complaint (Doc. No. 1) asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of California's unfair competition law, violation of Pennsylvania's unfair trade practice and consumer protection law, and elder abuse under California law.  Plaintiffs seek declaratory and injunctive relief in addition to monetary

damages. Defendants responded on June 11, 2018, by filing a pre-answer motion (Doc. No. 12) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III.   APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the pleading standard Rule 8 announces but does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.* at 555. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Id.* Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement. *Id.* at 557.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.* at 557.

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (cleaned up).[1]

---

[1] The parenthetical "(cleaned up)" may be used "when extraneous, residual, non-substantive information has been removed" from a citation, in this case, bracketed modifications, internal quotation marks and duplicative parentheticals. *See, e.g., United States v. Steward*, 880 F.3d 983, 986 & n.2 (8th Cir. 2018).

Courts assess "plausibility" by "'draw[ing] on [our own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Courts "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Id.* (citation omitted). While *factual* plausibility is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Int'l, Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

## IV.    PLAINTIFFS' ALLEGATIONS

Plaintiffs contend that they represent three classes of persons who purchased Transamerica's universal life insurance policies in the late 1980s and early 1990s. Doc. No. 1 at ¶¶ 2-3, 78-83 (describing the purported subclasses of plaintiffs). They allege that in August 2015, "Transamerica suddenly, unilaterally, and massively began increasing monthly deductions withdrawn from the Policies accumulation accounts, falsely stating the increases were permitted by the terms of the Policies," when in fact, the purpose for the increases was "(a) to subsidize Transamerica's cost of meeting its interest rate guarantees under the Policies; (b) to recoup past losses in violation of the terms of the Policies; and (c) induce Policy terminations by policyholders." *Id.* at ¶ 3.

### A.    The Parties

Fairlie is a resident of Pennsylvania and the owner of a Transamerica universal life insurance policy with a face amount of $250,000 (Policy No. 92309935). *Id.* at ¶ 9. Wright is a California resident and the owner of a Transamerica universal life insurance policy with a face amount of $50,000 (Policy No. MM3356068). *Id.* at ¶ 10. In August 2015, each of plaintiffs' policies were subject to the cost increases that form the basis of the complaint. *Id.* at ¶ 14.

3

Transamerica Life and Transamerica Premier are corporations organized under Iowa law, with their principal places of business located in Cedar Rapids, Iowa. *Id.* at ¶¶ 11-13.

## B.    The Policies[2]

As noted above, each plaintiff claims to be the owner of a Transamerica universal life insurance policy (the Policy or Policies). Universal life insurance is more flexible than term or whole life insurance, as policyholders are free to adjust their premium payments:

> Premium payments, which are variable, are deposited in an accumulation account from which monthly cost of insurance and expense charges are deducted. The accumulation account is credited with monthly interest at a nonguaranteed declared rate, but not less than the guaranteed interest rate specified in the policy contract. Universal life insurance policies allow policyholders to change the amount and frequency of premium payments as long as their policies contain sufficient cash value to cover monthly deductions taken.

*Id.* at ¶ 19 & n.2. Importantly, an increase in the "monthly deductions" will correspond with a higher premium payment obligation.

The "monthly deduction" is meant to recover the costs associated with maintaining the Policy. The monthly deduction is withdrawn from the Policy's accumulation account at the end of each month. *Id.* at ¶¶ 19, 24. For Fairlie, the monthly deduction amount

---

[2] On a motion to dismiss pursuant to Rule 12(b)(6), the court ordinarily cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6); *see also Buck v. F.D.I.C.*, 75 F.3d 1285, 1288 n.3 (8th Cir. 1996). However, I may consider documents that are embraced by the pleadings without converting the motion into a summary judgment motion. *See, e.g., Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 972 n.3 (8th Cir. 1999) (citing *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997)). Here, plaintiffs attached Fairlie's and Wright's Policies to their resistance (Doc. No. 12) as Exhibits A and B (Doc. Nos. 12-2 and 12-3). Because the Policies are clearly embraced by the complaint, I will consider them for purposes of addressing Transamerica's motion to dismiss.

is equal to "the monthly [deduction] rate [(MDR)] times .001 times the difference between the death benefit and the accumulation value at the beginning of the policy year [and] [a] policy fee." Doc. No. 12-2 at 10. For Wright, the monthly deduction amount is equal to "the sum of the following: (a) The Cost of Insurance for the policy; and (b) The cost of additional benefits provided by riders; and (c) The Per Thousand Expense Charges multiplied by the number of thousands of Initial Face Amount or increase in Face Amount; and (d) The Per Policy Expense Charge." Doc. No. 12-3 at 11. The "Cost of Insurance" (COI) variable is further defined as the COI Rate multiplied by the results of the Death Benefit minus the Cash Value at the beginning of the Policy Month, divided by 1,000. *Id.* Although the Policies use different terms and slightly different calculations, the MDR in Fairlie's Policy and the COI rate in Wright's policy serve comparable functions and are essentially interchangeable. For purposes of the present motion I will refer to the terms collectively as the MDR.[3]

Plaintiffs allege that the MDR is the most important component of their Policies' monthly deductions. While the other variables are predictable and not subject to change, the MDR may be adjusted at Transamerica's discretion. Doc. No. 1 at ¶ 24. In Fairlie's Policy, the MDR is set as follows:

> **Monthly Deduction Rates** – At the beginning of each policy year, we will use the Insured's age as of that policy year to determine the rate for the monthly deduction. A breakdown of guaranteed maximum [MDRs] into cost of insurance and expense components for standard lives appears on pages 12, 13, 14 and 15.
>
> A Table of Guaranteed [MDRs] is in the policy data and is guaranteed. However, we may use lower rates than these guaranteed [MDRs]. We will never exceed the guaranteed [MDRs].

---

[3] In *McMahon et al. v. Transamerica*, C17-149-LTS, the disputed contract term is also referred to as a "Monthly Deduction Rate" or MDR. The MDR in the McMahon Policy appears to be substantially interchangeable with the MDR in the Fairlie Policy and the COI rate in the Wright Policy.

> A reduction in the guaranteed [MDR] for this policy will also apply uniformly to all other policies we issue on the same plan and on an Insured with the same issue age, issue date, sex, face amount and class of risk as the insured under this policy. The reduced rates will not be affected by any change in health or occupation of the Insured.

Doc. No. 12-2 at 9. The "breakdown of guaranteed maximum [MDRs]" describes which portion of the MDR represents COI factors and which portion represents "expense" factors for males and females, whether smoking or non-smoking. *Id.* at 16-19. The MDR increases incrementally for each group as the policyholder ages, with the rapidest increases occurring later in life. Male smokers have the fastest-growing MDR of all four groups. *Id.*

In Wright's Policy, the MDR is defined as follows:

> The [MDR] for a policy month is determined based on our projections of future mortality experience. We determine these rates uniformly based on the Insured's Attained Age, sex, policy duration and Premium Class.

> The rate for the Initial Face Amount is based on the Premium Class on the Policy Date. The rate for any increases in the Face amount is based on the Premium Class on the effective date of the increase.

> The [MDR] for a policy month is never greater than the Guaranteed [MDRs] shown in the Table of Monthly Guaranteed [MDRs]. The Guaranteed [MDRs] are based on the Commissioners 1980 Standard Mortality Tables, adjusted for age last birthday.

Doc. No. 12-3 at 11. The referenced table of Monthly Guaranteed MDRs lists different guaranteed rates, differentiated by the policyholder's age, sex, and smoking status, all of which are tied to the Commissioners 1980 Standard Ordinary Mortality Tables. *Id.* at 7.

Finally, both the Fairlie and Wright Policies are classified as "nonparticipating." Per the Fairlie Policy:

> **No Dividends are Payable** – This is non-participating insurance and does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by a change in the monthly deduction rates. Any change in the monthly deduction rates will be prospective and will be

subject to our expectations as to future cost factors. Such cost factors include mortality, expenses, interest and persistency.

Doc. No. 12-2 at 14. And per the Wright Policy: "This Policy does not participate in our profit or surplus, and does not pay dividends. Doc. No. 12-3 at 13.

Assuming the policyholders have paid sufficient premiums to cover the monthly deductions for the length of the Policy and no other exclusions apply, policyholders reap the benefits of the Policies in one of three ways. First, if the policyholder dies before age 100, the death benefit (the face value of the Policy) will be paid to the policyholder's designated beneficiary. *See, e.g.,* Doc. No. 12-2 at 2. If the policyholder lives to the age of 100, the policyholder is entitled to the Policy's cash value (premiums paid plus interest paid, less monthly deductions). *Id.* at 2, 7. Finally, if a policyholder no longer wishes to participate in the insurance plan or the Policy has otherwise lapsed, he or she is entitled to "surrender" the Policy and take its cash value, less a surrender penalty. *Id.* at 13. Plaintiffs contend the third option is the most valuable option for Transamerica.

## C.    *The Claims*

Universal life insurance policies were highly attractive to consumers in the 1980s and 1990s, as a result of historically high interest rates. Doc. No. 1 at ¶ 22. Today, however, interest rates are very low, "making it difficult for insurers to credit the rates the insurers promised when they sold the policies twenty years ago." *Id.* at ¶ 23. As a result, the reserve funds held by Transamerica to cover the Policies' guaranteed interest rates have not kept up with Transamerica's projections, leaving it with insufficient money to cover the Policies at a profit. Compounding the problem, Transamerica has suffered cash-flow problems due to its relationship with its ultimate parent company, AEGON NV (AEGON), which demands significant dividend payments. *Id.* at ¶¶ 43-48. In order to solve its cash-flow problem, Transamerica allegedly engineered a series of captive reinsurance transactions, transferring the risk of loss on the Policies to its wholly-owned affiliates. *Id.* The transfers generated a purported "surplus reserve credit," which

Transamerica relied upon to justify spending from the reserves in the form of significant dividends to AEGON. *Id.*

Plaintiffs contend that these actions further weakened Transamerica's policy reserves, resulting in near-term losses to its bottom line. *Id.* at 48. "By depleting its capital surplus to benefit its foreign parent company at the expense of its policyholders, Transamerica knowingly increased the potential adverse impact of losses stemming from the Policies' high interest guarantees and other financial reversals." *Id.* According to plaintiffs, Transamerica's increased risk on the Policies led it to suddenly and without precedent increase the MDR for a purpose not permitted by the Policies. *Id.* at ¶¶ 48-55. Plaintiffs contend that no other justification for the MDR increases fits the known facts, as mortality rates have not changed in a meaningful way and Transamerica's reports to regulators demonstrate that the COI for the Policies has not meaningfully changed. *Id.* at ¶¶ 57-62. Plaintiffs allege that Transamerica's ultimate goal is to recoup past losses by encouraging "shock lapses" – a wave of policyholders surrendering their Policies to avoid the higher MDR and corresponding higher monthly premiums. *Id.* at ¶ 63-70. Plaintiffs contend that these adverse actions were coupled with other underhanded behaviors intended to further induce Policy lapses. *Id.* As a result, "thousands of class members [are] faced with either paying exorbitant and improper increases that cannot be justified . . . or surrendering the Policies and walking away from years of premium payments." *Id.* at ¶ 6.

## V.    DISCUSSION

Transamerica first argues that Wright's claims must be dismissed in their entirety, because the pleadings embrace only the contract terms contained in Fairlie's Policy.[4]

---

[4] For the remainder of its motion, Transamerica directs its argument exclusively towards Fairlie's Policy, perhaps assuming success on its first argument. Nevertheless, I will consider whether its arguments apply to Wright's Policy.

Turning to the breach of contract claim, Transamerica argues that plaintiffs fail to state a claim for breach of contract because the Policies do not limit which factors Transamerica takes into consideration when setting the MDRs, as long as Transamerica does not exceed the maximum guaranteed MDRs. Regarding plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, Transamerica repeats its argument that it did not breach the contract, and contends as a result that it did not injure plaintiffs' rights under the Policies.[5] Transamerica contends that Fairlie's claim for a violation of Pennsylvania's consumer protection laws fails to meet the requirements under that law. And finally, Transamerica claims that plaintiffs' request for declaratory judgment must be dismissed because it is duplicative of the breach of contract claim. Plaintiffs generally resist.

## A.     Wright's Claims

Transamerica argues that "[e]ach of Plaintiff Wright's claims is based on an alleged violation of provisions found in the Fairlie Policy concerning Monthly Deductions and MDRs, but not found in his Policy." Doc. No. 12-1 at 13. Presumably, Transamerica is relying on the slight differences in the contract terms between the two Policies to argue that the complaint invokes only Fairlie's Policy. (e.g., Wright's policy does not use the term "Monthly Deduction Rate," therefore, the complaint does not cover his policy). This argument ignores the facts, discussed above, that both Policies contain a monthly "rate" that factors into the monthly cost of the Policies, which is subject to Transamerica's discretion, is tied to various COI factors and was allegedly subject to a massive, unprecedented increase in August 2015. The fact that the "rates" at issue – Monthly Deduction Rate or Cost of Insurance Rate – have slightly different names is

---

[5] For the contract claims, the parties are proceeding under the assumption that Iowa law applies. As such, I will do the same. The remaining claims allege violations of California and Pennsylvania consumer and elderly protection laws.

ultimately irrelevant. The complaint clearly embraces both Policies. Transamerica's motion to dismiss Wright's contract claims (Counts One and Two) on this basis is denied.

Transamerica did not address the claims alleged by Wright (on behalf of himself and similarly situated policyholders in California) arising from California's Unfair Competition Laws and California's laws against elder abuse. Courts have the discretion to dismiss a claim *sua sponte* on 12(b)(6) grounds if "it is patently obvious the plaintiff could not prevail based on the facts alleged in the complaint," *Murphy v. Lancaster*, 960 F.2d 746, 748 (8th Cir. 1992) (citation omitted). Here, however, I decline to do so in the absence of briefing on this issue.

## B. *Count One—Breach of Contract*

Transamerica contends that this case is controlled by this contract term:

> A Table of Guaranteed [MDRs] is in the policy data and is guaranteed. However, *we may use rates lower than these guaranteed [MDRs]. We will never exceed the guaranteed [MDRs].*

Doc. No. 12-2 at 9 (emphasis added).[6] Because Transamerica did not exceed the guaranteed MDR, it argues, it did not breach the Policies. Transamerica argues that any other interpretation of this term would require rewriting the Policies to add additional terms. Plaintiffs respond that other contractual language provides context that supports their interpretation of the Policies. Transamerica counters that even if the Policies' terms

---

[6] Transamerica's motion to dismiss did not address the potential "plain meaning" of the Policy language at issue in Wright's Policy. However, as discussed above, the Policy contains a similar term addressing Transamerica's discretion to set the MDR:

> The [MDR] for a policy month is never greater than the Guaranteed [MDRs] shown in the Table of Monthly Guaranteed [MDRs]. The Guaranteed [MDRs] are based on the Commissioners 1980 Standard Mortality Tables, adjusted for age last birthday.

Doc. No. 12-3 at 11.

somehow limit their discretion to set the MDRs up to the guaranteed maximum rate, plaintiffs have failed to plausibly allege that they exercised their discretion contrary to the terms of the Policies.

Under Iowa law:

[T]o establish a claim for a breach of contract, the [plaintiff] must show:

> (1) The existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citation omitted).  Here, the precise meaning of the terms and conditions of the contract are in dispute.  Plaintiffs contend that in raising the MDRs in August 2015, Transamerica considered its own past losses rather than the future cost of maintaining the Policies and mortality-related factors.  The allegations in the complaint, accepted as true, plausibly establish for the purposes of this motion that the Transamerica's actions were intended to recover past losses.  Therefore, the only issue is whether such action could be considered a breach of the contract.  A number of federal district courts have considered a similar challenge to the type of policy at issue, although neither the Eighth Circuit Court of Appeals nor the Iowa Supreme Court appear to have weighed in on the precise contract language at issue.

In *Norem v. Lincoln Ben. Life. Ins. Co.*, No. 10 C 2233, 2012 WL 1034495 (N.D. Ill. Mar. 20, 2012), the policy stated that the "cost of insurance (COI)" rates would be "based on the insured's sex, issue age, policy year, and payment class.  The rates will be determined by us, but they will never be more than the guaranteed rates shown on Page 5." *Id.* at *1.  It was undisputed that the defendant considered those factors, as well as "anticipated death benefit costs, expected policy lapse rates, expected premium persistency, investment earnings assumptions, expenses, including agent commissions,

acquisition and maintenance expenses, taxes, policy size and expected distributions . . ." in setting the COI rates. *Id.* The plaintiff argued that those factors that were unrelated to the insured's sex, issue age, policy year and payment class were impermissible considerations according to the meaning of the phrase "based on" in the policy. *Id.*

The court concluded that the term "based on" meant that the listed factors were "the foundation, principal components, or fundamental ingredients of the COI rates but not the exclusive factors to be considered in setting those rates." *Id.* Thus, plaintiff's claim failed as a matter of law in the absence of a COI rate above the guaranteed maximum rate. *Id.* at *2. The District of New Jersey reached a similar decision in *Coffman v. Pruco Life Ins. Co.*, No. 10-CV-03663(DMC)(MF), 2011 WL 4550152 (D.N.J. Sept. 29, 2011), a case in which the policy charged a "maximum monthly rate" that was "based on the Commissioners 1980 Standard Ordinary Smokers Mortality Table," and provided that the defendant "may charge less than these rates." *Id.* at *1, *3 ("Plaintiff wants this Court to insert the word 'only' and/or 'true' into 'expected cost of mortality' so that the Policy is akin to 'Defendant can only consider its expected cost of mortality.'").

In California, however, three groups of plaintiffs have succeeded in stating a claim for breach of contract against Transamerica with regard to policies that are substantially similar to the Policies at issue here. In *Feller v. Transamerica Life Ins. Co.*, 2:16-cv-01378-CAS (AJWx), 2016 WL 6602561 (C.D. Cal. Nov. 8, 2016), "[a]ll of the policies at issue . . . connect the MDR to *at least* the policyholder's age and whether or not they are a smoker" and some of the policies "equate the MDR with the 'cost of insurance' ('COI')." *Id.* at *9. In denying Transamerica's motion to dismiss, the court explained:

> Whether or not Transamerica is permitted to consider other factors, certain provisions in the policy can be read to preclude consideration of the policy's own guaranteed interest. For instance, if certain interest rate accruals are "guaranteed," a plausible reading of the policies is that defendants may not directly offset them by increasing the MDR based on its interest obligations.

In light of the foregoing, and accepting plaintiffs' allegations as true, the Court concludes that the policies' language is reasonably susceptible to plaintiffs' interpretation, namely, the policies could reasonably be read as requiring that MDR changes be connected to mortality costs and risk categories among policyholders.

*Id.* at \*10; *see also id.* at \*11 ("Defendant appears to acknowledge that, if it did raise MDRs to recoup past losses, it would constitute breach of contract."). The Central District of California has reached similar conclusions in two other cases: *EFG Bank AG, Cayman Branch v. Transamerica Life Ins. Co.*, 2:16-cv-08104-CAS (AJWx), 2017 WL 3017596, at \*6 (C.D. Cal. July 7, 2017) ("[P]laintiffs are not required to allege that MDRs increased above the maximum amount in order to state a claim for breach. Instead, as they do here, plaintiffs may allege an impermissible MDR increase."); *DCD Partners, LLC v. Transamerica Life Ins. Co.*, No. CV15-3238-CAS(VBKx), 2015 WL 12697657, at \*6 (C.D. Cal. Dec. 23, 2015) ("[P]laintiffs do not merely allege a change in the MDR. Rather, they allege that, as of January of this year, premium rates had increased by 135.8%).

Transamerica argues that the *Norem* and *Coffman* cases are better reasoned, and should control, because they stick to the "plain language" and "four corners" of the Policies, whereas the court in California "rewrites" the Policies. Transamerica argues that the stated limitation on its discretion to set the MDR – up to the maximum guaranteed rates – forecloses consideration of other, unstated limitations on its discretion. Transamerica further argues that the placement of the non-participation clause under a separate header than the grant of discretion to set the MDRs demonstrates that the non-participation clause has no effect on Transamerica's discretion to set the MDR (up to the maximum guaranteed rate). These arguments are unpersuasive at this stage in the case.

When interpreting contracts,

[Iowa courts] give effect to the language of the entire contract according to its commonly accepted and ordinary meaning. Moreover, particular words and phrases are not interpreted in isolation. Instead, they are interpreted in

> a context in which they are used. Furthermore, the words are given the
> meaning at the time the contract was executed.

*Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797-98 (Iowa 1999) (citations omitted). A cardinal rule of contract construction or interpretation is that the intent of the parties must control. *Id.* at 797 (citation omitted). "If the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine intent." *Id.* (citation omitted). Further, although courts do not "rewrite" contract terms:

> Reading an existing contractual provision as having an essential corollary
> is different from adding a new implied term to a contract. The former is
> an interpretive exercise and is permissible even if the agreement is
> integrated. An integrated contract can contain an implicit, unstated, but
> necessary term . . . . It is of no relevance if the promise, albeit imperfectly
> expressed, is implicit in the contract as written.

*Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 729 (Iowa 2014) (cleaned up).

Transamerica's interpretation of the grant of discretion comports with a "plain meaning" interpretation only by ignoring other parts of the Policy. *Hartig Drug*, 602 N.W.2d at 797 ("[P]articular words are not interpreted in isolation."). Although the phrases "We will determine" the MDR and "We may use rates lower . . . [w]e will never use higher rates" suggest substantial grants of discretion to Transamerica when read in isolation, other Policy terms provide apparent limitations on the ability to exercise that discretion. Several terms – in both the Fairlie and the Wright Policies – provide some support for an argument that Transamerica's discretion in setting the MDR is limited to COI factors.

First, both policies repeatedly link the MDR to commonly understood COI factors such as mortality. For the Fairlie Policy, the tables titled "Breakdown of Guarantee Maximum [MDRs] into Cost of Insurance and Expense Components" tables clearly demonstrate that COI factors make up the majority of the total monthly deduction cost. Doc. No. 12-2 at 16-19. Any reduction in the MDR is meant to "apply uniformly to all other policies . . . with the same issue age, issue date, sex, face amount and class of risk

as the insured." *Id.* at 9.  Under the "General Provisions" heading, the Policy provides that a misstatement of Age or Sex in the application – both factors that affect the COI – will result in a correction of past monthly deduction amounts, again tying the MDR to commonly understood COI facts.  *Id.* at 14.  Further, the guaranteed "cash values"[7] as required under law by the Policy are "based on the guaranteed monthly deduction rates and the guaranteed interest rate."  These "minimum cash values" are tied to "the Commissioner[']s 1980 Standard Ordinary Smoker/Nonsmoker Combined Ultimate Mortality Tables for males and females, age nearest birthday and 4% interest."  *Id.*

The Wright policy has substantially similar features, including a statement that the MDRs are "based upon Commissioners 1980 Standard Ordinary Mortality Tables" (Doc. No. 12-3 at 7, 11), that the MDR is "based on our projections of future mortality experience" and uniformly determined "based on the Insured's Attained Age, sex, policy duration and Premium Class" (*Id.* at 11), and that the MDR will be corrected retroactively in the event of a misstatement of age or sex (*Id.* at 13).  The repeated references to mortality factors in both policies supports an inference that the MDR accounts for the cost of insuring policy holders, not for Transamerica's profitability.  *See Langlas v. Iowa Life Ins.*, 63 N.W.2d 885, 887 (Iowa 1954) (the language of an insurance contract "must be given its common and ordinary meaning and *must be construed as popularly understood*." (emphasis added)).

Second, the Fairlie Policy[8] contains a provision which appears to *explicitly* prohibit the consideration of past losses in calculating the MDR:

> We do not distribute past surplus or *recover past losses by a change in the MDRs*.  Any change in the [MDRs] *will be prospective and will be subject*

---

[7] As discussed above, the "cash value" of the Policy is the amount the policyholder is entitled to recover (less a forfeiture fee) in the event that the Policy lapses.

[8] The Wright Policy's non-participation clause does not explicitly address "past losses" in the same manner as the Fairlie Policy.  However, given the strength of the connection between the MDR and other factors related to COI throughout the contract, this missing term is not fatal to Wright's claim at this stage of the case.

*to our expectations as to future cost factors*. Such cost factors include mortality, expenses, interest and persistency.

Doc. No. 12-2 at 14 (emphasis added). Transamerica argues that this sentence does not serve as a limitation on the use of the MDR to recover past losses, but rather as a notification. Whatever Transamerica thinks this unexplained distinction might mean, this Policy language clearly signals that changes in the MDR to recover Transamerica's losses were not anticipated at the time the contract was negotiated. *Hartig*, 602 N.W.2d at 797 ("The important time frame for determining [the parties' intent] is the time the contract was executed."). Any other interpretation of the "No Dividends are Payable" term should not be construed to render the provision prohibiting "recover[ing] past losses by changing the MDRs" meaningless.

I agree with the court in *Feller*[9] that the Policies at issue are susceptible to plaintiffs' interpretation. It is apparent from the face of the contract that Transamerica cannot consider its past losses in exercising its discretion to set the MDR in the Fairlie Policy, and it is plausible that there are other limitations on its exercise of discretion in both Policies. Because plaintiffs have adequately plead that Transamerica considered past losses and factors other than those related to the COI in raising the MDR, Transamerica's motion to dismiss Count One is denied.

---

[9] One of the policies in *Feller* expressly permitted Transamerica to consider "mortality; expenses; *interest*; persistency; and any applicable federal state and local taxes" in setting the MDR. *Id.* at *10 (emphasis added). The claims arising from that policy were dismissed for failing to state a claim upon which relief could be granted. The same term is present in the Fairlie Policy; however, on this point I depart from the *Feller* Court's reasoning. I find that this limitation likely allows Transamerica to consider *future* interest rate changes in calculating the MDR. However, because the Policy permits only prospective changes, and does not permit the recovery of losses by manipulating the MDR, I disagree with the conclusion that this term automatically defeats the breach of contract claim.

## C.     Count Two—Breach of the Implied Covenant of Good Faith

Transamerica argues that plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing because they have failed to plead that Transamerica "technically complied with the contract while acting contrary to the purpose for which the contract was made." Doc. No. 12-1 at 18. Put another way, because Transamerica argues that the breach of contract claim is unsupported by the Policies' terms, and because plaintiffs allege a violation of the Policies' terms, the claim for a breach of the implied covenant is not a natural fit for these facts. Plaintiffs respond that Transamerica's MDR increase, while within the maximum guaranteed MDRs promised by the Policies, constitutes bad faith because it undermines the parties' rights in the contracts and was undertaken for the purpose of causing plaintiffs to terminate their life insurance Policies early, at a benefit to Transamerica.

The implied covenant of good faith and fair dealing "inheres in all contracts and cannot be disclaimed." *Alta Vista*, 855 N.W.2d at 130 (citing *Fogel v. Trs. Of Iowa Coll.*, 446 N.W.2d 451, 456 (Iowa 1989). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citation omitted). This implied covenant generally operates upon a condition or term of a contract that is subject to the control of one of the parties. *See, e.g. Midw. Mgmt. Corp. v. Stephens*, 291 N.W.2d 896, 913 (Iowa 1980) (stating that a contract affording one party "sole discretion" to terminate the contract required party "to exercise that discretion in a reasonable manner on the basis of fair dealing and good faith."). However, the covenant "does not give rise to new substantive terms that do not otherwise exist in the contract." *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012) (citation omitted). "Instead . . . the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005).

Plaintiffs allege four bases for this claim:

Transamerica exercised its discretion in bad faith and breached the implied covenant of good faith and fair dealing by, among other things:

    a.    Exercising its discretion to increase the [MDR] to recoup past losses;

    b.    Misrepresenting to Plaintiffs and class members the reasons for the [MDR] increase

    c.    Intending for the [MDR] increase to force Plaintiffs and class members to surrender their Policies so Transamerica would not have to pay the death benefits; and

    d.    Negating the value of what were intended to be guaranteed interest rates, which Transamerica has no right to do.

Doc. No. 1 at ¶ 105.

Plaintiffs plausibly allege that their purpose in purchasing the Policies was to secure affordable life insurance while taking advantage of the guaranteed interest rate and avoiding the potential risks of a future economic downturn. Plaintiffs also plausibly allege that by raising the MDR for the purpose of inducing shock lapses and by misrepresenting the reasons for the MDR increase, Transamerica has acted in bad faith to undermine plaintiffs' rights in the Policies. Transamerica's argument that it did not raise the MDR's above the guaranteed maximum rate misses the point, because technical compliance with the contract terms does not defeat a claim for breach of the implied covenant of good faith and fair dealing. *See Mid-Am.*, 406 F.3d at 974; *see also Midwest Mgmt.*, 291 N.W.2d at 913 (describing duty "to exercise [] discretion in a reasonable manner on the basis of fair dealing and good faith."). Transamerica's argument that it did not raise the MDRs for the purposes alleged ignores the directive, at this stage of the case, to accept the factual allegations of the complaint as true. *Ashcroft*, 556 U.S. at 677. Transamerica's motion to dismiss Count Two is denied.

## D. Count Three—Pennsylvania's Unfair Trade Practice and Consumer Protection Law (UTPCPL)

Transamerica argues that Fairlie has failed to state claim under the UTPCPL because the facts described do not set out a violation of the relevant statutes. Specifically, Transamerica argues that Fairlie has not sufficiently alleged the existence of a written guarantee or warranty or justifiable reliance on deceptive conduct at the time of entering the agreement. Further, Transamerica contends that Fairlie's claims are barred under the "economic loss"[10] and "gist of the action" doctrines.

Pennsylvania's UTPCPL makes it unlawful for individuals or businesses to engage in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce. 73 P.S. § 201-3. The UTPCPL permits "[any] person who purchases or leases goods or services primarily for personal, family or household purposes" to bring a private action if he or she suffers any damage as the result of the use of a "method, act or practice" declared unlawful under the UTPCPL. 73 P.S. § 201-9.2. The statute is to be construed liberally to effect its objective of preventing unfair or deceptive business practices. *Com. v. Monumental Props., Inc.*, 329 A.2d 812, 815-17 (Pa. Sup. Ct. 1974). Malfeasance – the improper performance of a contractual obligation – is actionable under the UTPCPL. *Caplan v. Fellheimer, Eichen, Braverman & Kaskey*, 5 F. Supp. 2d 299, 302 (E.D. Pa. 1998) (collecting cases). Under Pennsylvania law, malfeasance includes conducting contract duties in an unfair or incompetent manner. *See,*

---

[10] Transamerica's argument based on the economic loss doctrine is not supported by Pennsylvania law. *See, e.g., Knight v. Springfield Hyundai*, 81 A.3d 940, 951-52 (Pa. Super. Ct. 2013) ("Appellees further asserted . . . that the economic loss doctrine barred Knight's UTPCPL claims, as she alleged damages that were purely economic, and there is no cause of action in tort for loss that is solely economic. Our research reveals, however, that our Supreme Court has defined the economic loss doctrine as providing 'no cause of action exists for *negligence* that results solely in economic damages unaccompanied by physical injury or property damage.' The claims at issue in this case are statutory claims brought pursuant to the UTPCPL, and do not sound in negligence. Therefore, the economic loss doctrine is inapplicable and does not operate as a bar to Knight's UTPCPL claims.") (citations omitted).

*e.g.*, *Seidman v. Minn. Mut. Life Ins. Co.*, 40 F. Supp. 2d 590, 595-96 (E.D. Pa. 1997); *Parasco v. Pacific Indem. Co.*, 870 F. Supp. 644, 648 (E.D. Pa. 1994). Further, misrepresentation is defined broadly under the UTPCPL:

> The pre-1996 catchall provision of the UTPCPL prohibited "fraudulent conduct" and required proof of common law fraud for a claim to succeed. In 1996, the General Assembly revised the catchall provision to broaden the scope of actionable conduct from "fraudulent conduct" to "deceptive conduct." The post-1996 catchall provision thus eliminated the requirement of proving fraud to succeed under the UTPCPL. *Bennett*, 40 A.3d at 154. Any deceptive conduct "which creates a likelihood of confusion or of misunderstanding can constitute a cognizable claim" under the UTPCPL.

*Dixon v. N.W. Mutual*, 146 A.3d 780, 789-90 (Pa. Super. 2016) (citing *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3D 145, 151 (Pa. Super. 2012)) (cleaned up). Thus, a plaintiff need not prove the elements of common law fraud (material, false representation with scienter and intent) in order to succeed on a claim for deceptive practices under the UTPCPL.

Fairlie asserts claims based on two alleged, unlawful acts under the UTPCPL: (1) Transamerica "[f]ail[ed] to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or service is made" and (2) Transamerica "[e]ngag[ed] in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4). Fairlie alleges that Transamerica engaged in deceptive conduct by substantially raising the MDR to recover past losses (and for other impermissible reasons), and by providing a misleading explanation for the MDR increases. I find that these allegations, when accepted as true, plausibly constitute malfeasance under Pennsylvania law. Thus, I must consider whether the "gist of the action" doctrine bars Fairlie's claims as a matter of law.

The Pennsylvania Supreme Court has established the following test to determine if a claim is barred by the gist of the action doctrine:

> If the facts of a particular claim establish that the duty breach is one created by the parties by the terms of their contract – i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but

> for the existence of the contract – then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 53 (Pa. 2014). In *Dixon*, the Pennsylvania Superior Court held that a claim arising from inaccurate statements on an insurance billing statement – a deception or misrepresentation under the UTPCPL – was not foreclosed by the "gist of the action" doctrine because the misrepresentation was not essential to the breach of contract claim. 146 A.3d at 788-89. The same reasoning appears to apply to Fairlie's claims, at least at this stage of the case. Transamerica's motion to dismiss Count Three is denied.


### E.      Declaratory Judgment

Finally, Transamerica argues that plaintiffs' request for declaratory judgment should be dismissed as duplicative of the breach of contract claim. Specifically, Transamerica argues that "when a request for declaratory judgment simply asks the court to declare that the contract was breached, it 'is nothing more than a petition claiming breach of contract' and may be dismissed." Doc. No. 16-1 at 23 (citing *Daum v. Planit Solutions Inc.*, 619 F. Supp. 2d 652, 657 (D. Minn. 2009)). Plaintiffs respond that simply resolving the breach of contract claim may not resolve the full reach of the parties' respective rights and responsibilities under the Policies.

The Declaratory Judgment Act provides that, "[I]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Federal Rule of Civil Procedure 57 further clarifies that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. "[D]istrict courts possess discretion in determining whether and when to entertain an action under

the Declaratory Judgment Act, even when the suit otherwise satisfied subject matter jurisdiction." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

Although there is overlap between the claim for breach of contract and the request for a declaratory judgment, such that the claims may be considered duplicative, it is unclear at this point whether resolution of plaintiffs' breach of contract claim would necessarily resolve the parties' prospective rights under the Policies. Dismissal of the declaratory judgment action is premature. The motion to dismiss this claim will be denied.

## *VI.    CONCLUSION*

For the reasons discussed above, defendants' motion to dismiss (Doc. No. 12) is **denied** in its entirety.

**IT IS SO ORDERED.**

**DATED** this 11th day of July, 2018.

_____
Leonard T. Strand, Chief Judge